COLORADO COURT OF APPEALS                                2016COA170

---

Court of Appeals No. 15CA2015
City and County of Denver Juvenile Court Nos. 15JD668 & 15JD699
Honorable D. Brett Woods, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.B.,

Juvenile-Appellant.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
SENTENCE VACATED, AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
Hawthorne and Navarro, JJ., concur

Announced November 17, 2016

---

Cynthia H. Coffman, Attorney General, Joseph G. Michaels, Assistant Attorney
General, Denver, Colorado, for Petitioner-Appellee

Michael S. Juba, Alternate Defense Counsel, Denver, Colorado, for
Juvenile-Appellant

¶ 1 The Denver Juvenile Court found A.B., a juvenile, guilty of possession of a weapon by a previous offender (POWPO), adjudicated him a delinquent, and imposed a sentence of one to two years in the Division of Youth Corrections. On appeal, A.B. contends the court erred in denying his motion to suppress the weapon as the fruit of an unlawful seizure; in treating a pending deferred adjudication as a prior adjudication for purposes of POWPO; and in finding him a repeat juvenile offender — based on the same deferred adjudication — for sentencing. Both of the deferred adjudication contentions raise novel questions in Colorado.

¶ 2 We affirm the denial of A.B.'s motion to suppress because even assuming that a seizure of A.B. occurred when the police contacted him, they had a reasonable suspicion that he had violated Denver Revised Municipal Code 38-39, entitled "Disturbance of the peace." But because we conclude that a prior deferred adjudication does not satisfy the prior adjudication element of POWPO, we reverse A.B.'s adjudication.[1]

---

[1] Given this conclusion, we need not address A.B.'s repeat juvenile offender contention, which affects only sentencing.

## I. Background and Procedural History

¶ 3     On May 6, 2015, the Adams County District Court accepted A.B.'s agreement to a deferred adjudication on a charge of aggravated motor vehicle theft in the first degree, a felony, and deferred entry of adjudication for one year. Based on the county of A.B.'s residence, the case was transferred to the Denver Juvenile Court as 15JD668.

¶ 4     Less than four months later, Denver police officers arrested A.B. on the POWPO charge at issue.

¶ 5     The juvenile court held an evidentiary hearing on A.B.'s motion to suppress the weapon. One of the officers testified to how he had found a handgun in the back seat of a car in which A.B. was a passenger, as discussed fully in Part II below. The court denied the motion. Then the court proceeded to trial, with the officer presenting the same testimony. The prosecution's evidence included the deferred adjudication in 15JD668.

¶ 6     When the prosecution rested, A.B. moved for judgment of acquittal. He conceded the deferred adjudication involved a felony, but he argued that it did not constitute proof of a prior adjudication for purposes of POWPO. As to juveniles, POWPO prohibits

possessing a firearm "subsequent to the person's *adjudication* for an act which, if committed by an adult, would constitute a felony." § 18-12-108(3), C.R.S. 2016 (emphasis added). The court denied the motion, A.B. declined to present any evidence, and the court found him guilty.

¶ 7 At sentencing, the prosecutor urged the court to find A.B. a repeat juvenile offender, again based on the deferred adjudication. The court revoked the deferred adjudication, on that basis found A.B. a repeat juvenile offender, and imposed a sentence of one to two years in the Division of Youth Corrections.

¶ 8 The Attorney General agrees that all of the issues A.B. raises in this appeal were preserved.

## II. Motion to Suppress

¶ 9 A.B. first contends the trial court erred by denying his motion to suppress the handgun. A.B. asserts that the search was unconstitutional because when police officers ordered him to get back in the car, they seized him but lacked reasonable suspicion to do so. We conclude that the trial court properly denied A.B.'s motion.

## A. Standard of Review

¶ 10    A trial court's ruling on a motion to suppress presents a mixed question of fact and law. *People v. Martinez*, 165 P.3d 907, 909 (Colo. App. 2007). We defer to the trial court's findings of fact if they are supported by competent evidence in the record, but we review its conclusions of law de novo. *Id.* Of course, "[w]e review de novo the trial court's ultimate legal conclusion of whether a seizure violated constitutional prohibitions against unreasonable searches and seizures." *People v. Funez-Paiagua*, 2012 CO 37, ¶ 6.

## B. Additional Background

¶ 11    A.B. did not testify at the suppression hearing. One of the police officers testified that around 9 p.m. on the night of A.B.'s arrest, he heard "loud music coming from [a parked] vehicle . . . around 100 feet" away in an alley. The officer and his partner decided to contact the occupants of the vehicle "solely to investigate the noise violation," although they were not "responding to any citizen complaints." They pulled their patrol car behind the suspect vehicle, parking at a forty-five-degree angle. Immediately, all three occupants in the suspect vehicle "exit[ed] at the same time." A.B. got out of the "driver's side rear door."

4

¶ 12     As the officers left the patrol car, they "order[ed] everybody back into the [suspect] vehicle."  Both officers were "yelling."  A.B. then "turned his back to [the officer] and [that officer] saw him reach towards his waistband with his right hand."  The officer "observed a gun leaving his hand as he threw it into . . . the vehicle."

¶ 13     As to the noise violation, the officer explained that the loud music "was coming from a radio . . . [i]n the vehicle," although the officer did not see A.B. "operating the radio."  Nor did the "vehicle have a permit for sound amplification."

¶ 14     A.B.'s counsel argued that the officers' actions in blocking the suspect vehicle and then ordering the occupants back inside constituted a seizure, which required "reasonable articulable suspicion of criminal activity."  But according to counsel, the officers lacked such suspicion as to A.B. because as "a rear passenger in [the] vehicle," he could not "possibly violate [Denver Rev. Mun. Code 38-89] where the noise is coming from the car radio being operated from the front by a driver or possibly from the front passenger."

¶ 15     In denying A.B.'s motion, the trial court found:

- "The evidence is that [the officers heard] the loud noise coming from the car."

- "The officers pulled up behind the car. It's unclear as to precisely how they parked, whether they blocked the car or not but the officers had probable cause to be there because of the loud music coming from the car."

- "[A]ll three people got out of the car at about the same time, at the same time that [the officer] yelled at them."

- "And then [A.B.] turned, and that's when he reached for his waistband, and that's when [the officers] saw the gun."

### C. Law

¶ 16　Citizens enjoy a constitutional right to be free from unreasonable seizures. U.S. Const. amend. IV; Colo. Const. art. II, § 7. Still, "[n]ot every encounter between police and citizens implicates Fourth Amendment concerns because a 'seizure' does not occur until a police officer has restrained the liberty of the citizen." *People v. Marujo*, 192 P.3d 1003, 1005 (Colo. 2008). The "key question in determining whether a person has been 'seized' is whether, 'in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 1006 (citation omitted).

¶ 17 A police officer may "seize" a person and conduct an investigatory stop if three conditions are met: (1) the officer must have a reasonable suspicion that criminal activity has occurred, is taking place, or is about to take place; (2) the purpose of the intrusion must be reasonable; and (3) the scope and character of the intrusion must be reasonably related to its purpose. *People v. Janis*, 2016 COA 69, ¶ 46.

¶ 18 "Reasonable suspicion exists when the facts known to the officer, taken together with rational inferences from those facts, create a reasonable and articulable suspicion of criminal activity which justifies an intrusion into the defendant's personal privacy at the time of the stop." *Funez-Paiagua*, ¶ 9. To determine whether reasonable suspicion exists, "a court must consider the facts and circumstances known to the officer at the time of the intrusion." *Id.*

### D. Analysis

¶ 19 Initially, the parties disagree as to whether the officers seized A.B.

¶ 20    The Attorney General argues that merely telling A.B. to return to the vehicle was an instruction "required for a safe encounter," not a seizure.  *See People v. Fines*, 127 P.3d 79, 81 (Colo. 2006) ("[A] passenger is not seized . . . merely because the vehicle in which she is riding is subjected to a traffic stop, nor does her removal from the car for safety reasons, without particularized suspicion, amount to an illegal seizure of her person.") (citation omitted).  And according to the Attorney General, the officers' parking behind the vehicle was "a display of authority directed at the car, not A.B."

¶ 21    A.B. responds that a seizure occurred because the "[o]fficers approached the vehicle and parked their fully marked police vehicle at an angle behind the parked vehicle, blocking it into the parking space;" and "[t]wo officers immediately exited their patrol vehicle and yelled at A.B. multiple times to get back into the vehicle."  *See Marujo*, 192 P.3d at 1006 ("Examples of circumstances that would lead a reasonable person to feel that he was not free to leave or terminate the encounter include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone

of voice indicating that compliance with the officer's request might be compelled.'") (citation omitted).

¶ 22    The following facts support the Attorney General: the officers did not activate their siren or emergency lights — instead they approached a parked vehicle, *see People v. Walters*, 249 P.3d 805, 809 (Colo. 2011) ("[W]hen a police officer does not pull over a vehicle, but approaches an individual in a vehicle that is already parked, the encounter does not automatically constitute an investigatory stop."); the officers did not display a weapon, *see id.* at 810 (finding no seizure where officer "did not display or gesture toward his weapon"); and the officers did not touch A.B., *see People v. Bowles*, 226 P.3d 1125, 1131 (Colo. App. 2009) ("[N]o testimony . . . suggests that either officer touched [defendant] or retained anything that might have prevented her from leaving the scene . . . .").

¶ 23    But other facts favor A.B.: the officers' patrol car was parked directly behind the suspect vehicle, potentially blocking it, *see People v. Scheffer*, 224 P.3d 279, 285 (Colo. App. 2009) (The defendant was not seized where there was "no indication in the record that either officer blocked defendant's path or impeded his

9

ability to terminate the encounter."); the officers demanded in a yelling tone that the occupants return to the vehicle, *cf. Marujo*, 192 P.3d at 1008 (There was no seizure where the officer "requested, but did not demand, that the [defendant] step toward him" and the officer "asked, but did not order, [the defendant] to submit to a pat down."); and A.B.'s ability to end the encounter by walking away was impeded by these demands, *see People v. Dixon*, 21 P.3d 440, 446 (Colo. App. 2000) (A seizure occurred where officer "had no lawful basis to order defendant back to the car.").[2]

¶ 24     Thus, whether A.B. was seized presents a close question. "[C]ourts are properly reluctant to resolve constitutional questions . . . ." *Libertarian Party of Colo. v. Williams*, 2016 COA 5, ¶ 22 (quoting *Smith v. Robinson*, 468 U.S. 992, 1007 (1984)) (*cert. granted in part* Sept. 12, 2016).  And resolving the unconstitutional seizure issue is not necessary if — even assuming A.B. was seized

---

[2] *But see United States v. Williams*, 419 F.3d 1029, 1033 (9th Cir. 2005) (holding that officer's order to get back into the vehicle merely maintained the status quo by returning the passenger to his original position); *Rogala v. District of Columbia*, 161 F.3d 44, 53 (D.C. Cir. 1998) (A passenger being ordered by the police to get back into a vehicle that she voluntarily exited was not an unreasonable seizure because "a police officer has the power to reasonably control the situation by requiring a passenger to remain *in* a vehicle during a traffic stop.").

— the seizure was supported by reasonable suspicion. For the following reasons, we conclude that it was.

¶ 25     Under Denver Revised Municipal Code 38-89(b):

> No person shall *use or operate or allow to be used or operated* any loudspeaker, public address system, radio, tape player, disc player or other sound-amplifying equipment in or on a motor vehicle in such a manner as to be plainly audible at twenty-five (25) feet from the motor vehicle unless a permit has been issued . . . .

(Emphasis added.)

¶ 26     The officer testified that he heard loud music coming from the vehicle that A.B. was in when it was approximately 100 feet away. These facts gave the officer reasonable suspicion to believe criminal activity — i.e., a violation of section 38-89(b) — was occurring. *See People v. Grenier*, 200 P.3d 1062, 1069 (Colo. App. 2008) (finding reasonable suspicion to support an investigatory stop where the defendant's nearby car was parked in violation of a local ordinance).

¶ 27     Conceding as much, A.B. argues that a potential violation of section 38-89(b) could not have provided reasonable suspicion *as to him* because the officer did not see A.B. operating the radio and his

11

ability to have done so from the back seat was doubtful. This argument falls short.

¶ 28    The scope of section 38-89(b) is broad: "[n]o person shall use or operate or allow to be used or operated" a range of sound-amplifying equipment, including a "loudspeaker, public address system, radio, tape player, [and] disc player." Viewing the facts and circumstances known to the officers when they pulled in behind the vehicle, reasonable suspicion existed as to all occupants. At that time, the officers knew only that loud music was coming from the vehicle. The source could have been a built-in dashboard radio accessible to front seat passengers or a stand-alone boombox in the rear passenger seat accessible to A.B.[3] Nor did they know who was operating the equipment. *See United States v. Hafford*, No. Crim. A. 11-14-BAJ-CN, 2011 WL 2269161, at \*2 (M.D. La. June 7, 2011) (Officer's "personal detection of loud music coming from [the defendant's] vehicle would be sufficient for

---

[3] Indeed, the car stereo could have been controlled from a phone in the rear seat. *See* Marcy Rauer Wagman & Rachel Ellen Kopp, *The Digital Revolution Is Being Downloaded: Why and How the Copyright Act Must Change to Accommodate an Ever-Evolving Music Industry*, 13 Vill. Sports & Ent. L.J. 271, 277 n.17 (2006) ("Using [a] Bluetooth adapter, customers hook the phone directly into their car stereo . . . .").

the officer to form a reasonable suspicion that the municipal ordinance was being violated."); *In re A.S.*, No. 04-10-00621, 2011 WL 1303700, at *3 (Tex. App. Apr. 6, 2011) ("[T]he vehicle in which [the juvenile] was riding was in violation of [a noise ordinance] . . . . Therefore, the initial stop of the vehicle and its occupants was supported by reasonable suspicion . . . .").

¶ 29    Alternatively, A.B. argues that the evidence does not show a violation of section 38-89(b) occurred "because there was no information that any party was actually disturbed." But his reliance on *Flores v. City & County of Denver*, 122 Colo. 71, 75, 220 P.2d 373, 375 (1950) — where the supreme court held "in order that any person 'shall disturb the peace of others,' it is necessary that the peace of others be actually disturbed, and, to establish the offense, proof of such actual disturbance is necessary" — is misplaced.

¶ 30    True enough, a violation of the noise ordinance in *Flores* required that "others in the vicinity [be] disturbed thereby." *Id.* at 73, 220 P.2d at 374. And such language is also found in section 38-89(a):

> It shall be unlawful for any person to disturb
> or tend to disturb the peace of others by
> violent, tumultuous, offensive or obstreperous
> conduct or by loud or unusual noises or by
> unseemly, profane, obscene or offensive
> language calculated to provoke a breach of the
> peace or for any person to permit any such
> conduct in any house or upon any premises
> owned or possessed by such person or under
> their management or control, when within
> such person's power to prevent, *so that others*
> *in the vicinity are or may be disturbed thereby.*

(Emphasis added.)

¶ 31    But section 38-89(b) does not include similar language.  Thus, we decline to interpret this section as requiring the disturbance of others.  *Cf. Dep't of Transp. v. Amerco Real Estate Co.*, 2016 CO 62, ¶ 32 ("We will not add words to a statute . . . [and] [i]n the absence of ambiguity, we apply the statute's language as written.").

¶ 32    In the end, we conclude that the arresting officers had reasonable suspicion to seize A.B. based on a suspected violation of section 38-89(b).  Thus, the trial court did not err by denying A.B.'s suppression motion.

### III.  Judgment of Acquittal

¶ 33    A.B. next contends that because section 18-12-108(3) does not identify a deferred adjudication as the predicate felony offense for

POWPO, the trial court erred by denying his motion for judgment of acquittal. We agree.

### A. Standard of Review

¶ 34    "When reviewing the denial of a motion for a judgment of acquittal, we 'review the record de novo to determine whether the evidence before the jury was sufficient both in quantity and quality to sustain the convictions.'" *Montes-Rodriguez v. People*, 241 P.3d 924, 927 (Colo. 2010) (quoting *Dempsey v. People*, 117 P.3d 800, 807 (Colo. 2005)).

¶ 35    In doing so, we usually ask whether the relevant evidence, viewed in the light most favorable to the prosecution, is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *People v. Gonzales*, 666 P.2d 123, 127 (Colo. 1983) (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)). But here, because the material facts are not in dispute, "we are not required to weigh the evidence." *Montes-Rodriguez*, 241 P.3d at 927. Instead, we must interpret section 18-12-108(3) de novo "and then apply it to the facts established at trial." *Id.*

## B. Statutory Construction Principles

¶ 36    Statutes should be interpreted "in strict accordance with the General Assembly's purpose and intent in enacting them." *In re 2000-2001 Dist. Grand Jury*, 97 P.3d 921, 924 (Colo. 2004). In determining both purpose and intent, we first look to the language chosen by the General Assembly, *see Martin v. People*, 27 P.3d 846, 851 (Colo. 2001), giving words and phrases their "plain and ordinary meaning," *People v. Dist. Court*, 713 P.2d 918, 921 (Colo. 1986). We read and consider the statute as a whole, construing it "to give consistent, harmonious, and sensible effect to all its parts." *Id.* And we must avoid a construction that would be at odds with the overall legislative scheme. *People v. Garcia*, 2016 COA 124, ¶¶ 8-10.

## C. Analysis

¶ 37    As to juveniles, section 18-12-108(3) provides:

> A person commits the crime of possession of a weapon by a previous offender if the person knowingly possesses, uses, or carries upon his or her person a firearm as described in section 18-1-901(3)(h) or any other weapon that is subject to the provisions of this article *subsequent to the person's adjudication* for an act which, if committed by an adult, would constitute a felony . . . .

16

(Emphasis added.)

¶ 38    A.B. was convicted under this section because when he possessed the handgun, he was under a one-year deferred adjudication for an act that would have constituted a felony. This much is undisputed. But whether the term "adjudication" includes a "deferred adjudication" under this section has never been addressed in Colorado. On this question, the parties disagree.

¶ 39    A.B. relies on the plain language. After all, section 18-12-108(3) speaks only of "adjudication," not "deferred adjudication."

¶ 40    In response, the Attorney General argues that because under section 18-12-108(1)[4] the term "conviction" "include[s] pending deferred judgments for adult offenders," the term "adjudication" in

---

[4] This section provides:

> A person commits the crime of possession of a weapon by a previous offender if the person knowingly possesses, uses, or carries upon his or her person a firearm as described in section 18-1-901(3)(h) or any other weapon that is subject to the provisions of this article *subsequent to the person's conviction* for a felony . . . .

§ 18-12-108(1), C.R.S. 2016 (emphasis added).

17

section 18-12-108(3) — by analogy — should include deferred adjudications. The Attorney General relies on cases uniformly interpreting the statutory term "conviction" as including a deferred judgment because the adult defendant pleaded guilty. *See People v. Allaire*, 843 P.2d 38, 41 (Colo. App. 1992) ("[T]he term 'conviction,' used without any reference to judgment, means merely the establishment of guilt by plea or verdict."); *see also People v. Kiniston*, 262 P.3d 942, 945 (Colo. App. 2011) ("[T]he legislature intended the term 'conviction' . . . to refer, as relevant here, to defendant's . . . guilty plea.").

¶ 41 At first glance, analogizing these two sections has some allure. To be sure, the purpose of POWPO "is to limit the possession of firearms by persons whose past conduct has demonstrated that they are unfit to be entrusted with such dangerous instrumentalities." *People v. Allen*, 111 P.3d 518, 520 (Colo. App. 2004). And juvenile offenders on deferred adjudications as well as adult offenders on deferred judgments have engaged in such conduct. But a closer look reveals several flaws in the Attorney General's analysis.

¶ 42     True, the definition of adjudication in section 19-1-103(2), C.R.S. 2016, includes "a juvenile [who] has pled guilty to committing a delinquent act." Even so, this definition applies only to title 19 (Children's Code). § 19-1-103 ("As used in this title or in the specified portion of this title, unless the context otherwise requires . . . ."). In contrast, POWPO is a criminal statute in title 18 (Criminal Code). And "[t]he purposes of the Criminal Code are quite different from the purposes of the Children's Code." *People v. Juvenile Court*, 893 P.2d 81, 88 (Colo. 1995). This principle looms large over our analysis. Had the General Assembly intended otherwise by making section 19-1-103(2) applicable to section 18-12-108(3), it could have cross-referenced it. *See People v. Day*, 230 P.3d 1194, 1197 (Colo. 2010) (finding that cross-reference in sentence enhancing statute to a statute containing a specific offense shows clear intent for the sentence enhancement provision to apply to that offense).[5]

---

[5] Numerous statutes in the Criminal Code refer to the Children's Code for definitions. *See* § 18-4-509, C.R.S. 2016 (The court has discretion, "in the case of a juvenile offender, to impose restorative justice, as defined in section 19-1-103(94.1)."); § 18-8-208, C.R.S. 2016 (An element of class 3 misdemeanor escape is that the person "escapes from a staff secure facility as defined in section

¶ 43    But even if the use of "adjudication" in POWPO — without a separate definition — favors looking to section 19-1-103(2), saying that "'adjudication' means conviction" is not the same as saying that the term "adjudication" includes a "deferred adjudication," much less that "'deferred adjudication' means conviction." To the contrary, the General Assembly "has expressed its intent to distinguish an adjudication of juvenile delinquency from a deferred adjudication *both as to definition and effect.*" *C.B. v. People*, 122 P.3d 1065, 1067 (Colo. App. 2005) (emphasis added).

¶ 44    To begin, the statute establishing deferred adjudications, section 19-2-709(1), C.R.S. 2016, provides:

> [I]n any case in which the juvenile has agreed with the district attorney to enter a plea of guilty, the court, with the consent of the juvenile and the district attorney, upon accepting the guilty plea and entering an order *deferring adjudication*, may continue the case for a period not to exceed one year from the date of entry of the order deferring adjudication.

Adjudication does not enter at the time of the order deferring adjudication. Instead, either the district attorney or probation

---

19-1-103(101.5)."); § 18-18-407, C.R.S. 2016 ("The defendant solicited, induced, encouraged, intimidated, employed, hired, or procured a child, as defined in section 19-1-103(18) . . . .").

20

officer may submit an "[a]pplication for entry of adjudication . . . at any time within the term of the deferred adjudication or within thirty-five days thereafter," or "[i]f the juvenile fails to comply with the terms of supervision, the court shall enter an order of adjudication." § 19-2-709(3.5) & (4).

¶ 45　　If neither scenario occurs — and the juvenile complies with the conditions of the deferred adjudication — then "*the plea* of the juvenile . . . shall be withdrawn and the case dismissed." § 19-2-709(3) (emphasis added).  One might wonder why this section says nothing about the adjudication having to be vacated. The answer is that at this point, an adjudication has not yet been entered.

¶ 46　　The Attorney General's argument that "a juvenile who has not yet completed his deferred adjudication has . . . an existing conviction" fails for two additional reasons.

¶ 47　　First, the argument ignores the differences between the Criminal Code and the Children's Code.  Under the Criminal Code, "[t]he acceptance by the court of a plea of guilty . . . acts as a conviction for the offense." § 16-7-206(3), C.R.S. 2016.  In contrast, "a Colorado juvenile adjudication is not a felony conviction." *People*

*v. Armand*, 873 P.2d 7, 10 (Colo. App. 1993); *see People v. Casillas*, 2015 COA 15, ¶ 32 (The defendant "was not convicted of a crime, because a deferred adjudication is not a final conviction.") (*cert. granted in part* May 16, 2016).

¶ 48    Second, where the General Assembly has sought to equate a deferred adjudication to a conviction, it has done so expressly.  *See* § 16-22-102(3), C.R.S. 2016 (Under the Colorado Sex Offender Registration Act, conviction "means having received . . . a deferred adjudication.").

¶ 49    Undaunted, the Attorney General correctly points out that under C.R.J.P. 1, "[p]roceedings in delinquency shall be conducted in accordance with the Colorado Rules of Criminal Procedure, except as otherwise provided by statute or by these rules."  Thus, the Attorney General continues, a deferred adjudication should be "treated the same as adult deferred judgments."  But this argument misses the mark because the Attorney General fails to identify anything in those rules that illuminates the nature of a deferred adjudication or the relationship between such an adjudication and a conviction.

¶ 50    Instead, the Attorney General cites *People in Interest of K.W.S.*, where the division held — in analyzing a juvenile's challenge to a deferred adjudication — that "where a defendant pleads guilty pursuant to a deferred judgment and sentence agreement, 'Crim. P. 35 review is not available until a deferred judgment is revoked and a judgment of conviction entered.'" 192 P.3d 579, 581 (Colo. App. 2008) (quoting *People v. Manzanares*, 85 P.3d 604, 611 (Colo. App. 2003)). But treating both deferred adjudications and deferred judgments similarly under Crim. P. 35 does not inform the question whether a deferred adjudication can be used under POWPO. This inquiry requires a statutory, not a rule-based, analysis.

¶ 51    With this distinction in mind, we look to statutes that treat deferred adjudications as distinct from adjudications to light the path. Under section 16-11.7-102, C.R.S. 2016, a "'[j]uvenile who has committed a sexual offense' means a juvenile who has been *adjudicated* as a juvenile *or* who receives a *deferred adjudication*." (Emphasis added.) Other examples abound.[6]

---

[6] *See also* § 18-1-1102(2), C.R.S. 2016 ("For purposes of paragraph (d) of subsection (1) of this section, conviction shall also include a juvenile delinquent *adjudication or deferred adjudication*.") (emphasis added); § 18-1.3-104(3)(b), C.R.S. 2016 ("For purposes of

¶ 52    But unlike these statutes, section 18-12-108(3) refers only to "adjudication." *See People v. Rediger*, 2015 COA 26, ¶ 29 ("[I]f the legislature had wanted to include 'any person carrying out the duties or functions of a public employee,' it could have done so by express language.") (*cert. granted on other grounds* Feb. 16, 2016). Thus, "we must accept the General Assembly's choice of language and not add or imply words that simply are not there." *People v. Benavidez*, 222 P.3d 391, 393-94 (Colo. App. 2009).

¶ 53    Given all this, only brief mention need be made of the Attorney General's emphasis on the purpose of POWPO to restrict possession of firearms based on past conduct. At this level, too, adults differ

---

this subsection (3), 'convicted' means a conviction by a jury or by a court and shall also include a deferred judgment and sentence, a *deferred adjudication, an adjudication,* and a plea of guilty or nolo contendere.") (emphasis added); § 18-1.3-602(2), C.R.S. 2016 ("'Conviction' means . . . *adjudication* for an offense that would constitute a criminal offense if committed by an adult. 'Conviction' also includes having received a deferred judgment and sentence or *deferred adjudication*; except that a person shall not be deemed to have been convicted if the person has successfully completed a deferred sentence or deferred adjudication.") (emphasis added); § 18-21-103(1.5), C.R.S. 2016 ("[E]ach juvenile who is *adjudicated* for commission of an offense that would constitute a sex offense if committed by an adult or who receives for such offense a *deferred adjudication* shall be required to pay a surcharge to the clerk of the court in which the adjudication occurs or in which the deferred adjudication is entered.") (emphasis added).

from juveniles.  Subject to POWPO and restrictions such as the "reasonable exercise of the state's police power," *Rocky Mountain Gun Owners v. Hickenlooper*, 2016 COA 45M, ¶ 21, adults enjoy a broad constitutional right to possess firearms.  *See* Colo. Const. art. II, § 13.  In contrast, a juvenile's possession of firearms is limited by section 18-12-108.5, C.R.S. 2016, which says, "[e]xcept as provided in this section, it is unlawful for any person who has not attained the age of eighteen years knowingly to have any handgun in such person's possession."

¶ 54    In sum, because the plain language of section 18-12-108(3) refers only to a prior "adjudication," the prosecutor's evidence of A.B.'s deferred adjudication did not prove his adjudication under this section.

¶ 55    The denial of A.B.'s motion to suppress is affirmed, the adjudication is reversed, the sentence is vacated, and the case is remanded for entry of a judgment of acquittal.

JUDGE HAWTHORNE and JUDGE NAVARRO concur.